James G. MALLAS; Robert V. Jones, Jr., Plaintiffs–Appellants,

and

John W. Flint; Perry Brunk; Peoples Supply Company, Incorporated; Omega Energy, Incorporated; Revel, Incorporated; Trinity Properties, Incorporated; Genesis Leases, Incorporated; Star Cross Properties, Incorporated, Plaintiffs,

v.

UNITED STATES of America, Defendant–Appellee,

and

Alvin H. Kolak; Joanne D. Miller; William H. Ball; Paul G. Topolka; Jack D. Yarbrough; Fred T. Goldberg, Jr.; Alan I. Weinberg; Larry L. Davis; Robert Forrest; Internal Revenue Service, Defendants.

James G. MALLAS; Robert V. Jones, Jr., Plaintiffs–Appellees,

and

John W. Flint; Perry Brunk; Peoples Supply Company, Incorporated; Omega Energy, Incorporated; Revel, Incorporated; Trinity Properties, Incorporated; Genesis Leases, Incorporated; Star Cross Properties, Incorporated, Plaintiffs,

v.

UNITED STATES of America, Defendant–Appellant,

and

Alvin H. Kolak; Joanne D. Miller; William H. Ball; Paul G. Topolka; Jack D. Yarbrough; Fred T. Goldberg, Jr.; Alan I. Weinberg; Larry L. Davis; Robert Forrest; Internal Revenue Service, Defendants.

Nos. 92–1982, 92–2027.

United States Court of Appeals, Fourth Circuit.

Argued March 1, 1993.

Decided May 20, 1993.

Georg Nicholas Herman, argued (Steven A. Bernholz, on brief), Bernholz & Herman, Chapel Hill, NC, for appellant.

Bruce Raleigh Ellisen, Tax Div., U.S. Dept. of Justice, Washington, DC, argued (James A. Bruton, Acting Asst. Atty. Gen., Gary R. Allen, Janet A. Bradley, Tax Div., U.S. Dept. of Justice, Washington, DC, and Robert H. Edmunds, Jr., U.S. Atty., Greensboro, NC, on brief), for appellee.

Before LUTTIG, Circuit Judge, MACKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation, and WILLIAMS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

LUTTIG, Circuit Judge:

The Internal Revenue Service, without explanation, continued to disseminate reports to tax shelter investors of plaintiffs James G. Mallas and Robert V. Jones, Jr., describing Mallas' and Jones' criminal convictions, even after a panel of this court had unanimously reversed those convictions. Mallas, Jones, and several corporations of which they are the sole shareholders, brought the instant action for damages against the United States under 26 U.S.C. § 7431, alleging that the reports constituted the unauthorized disclosure of their tax return information in violation of 26 U.S.C. § 6103. The district court dismissed the corporate plaintiffs but awarded Mallas and Jones $73,000 each in damages.

Three of the companies contest their dismissal and join with Mallas and Jones in challenging the court's dismissal of their claims for punitive damages. The Government cross-appeals, arguing that the district court erred in finding liability and in calculating the number of unauthorized disclosures. We reject both of the Government's arguments and affirm the finding of liability under section 7431. Because we conclude that only Mallas properly noted appeal, we dismiss the other plaintiffs for lack of jurisdiction. We agree with Mallas, however, that the district court erred in dismissing his punitive damages claims and therefore remand for a determination of whether such damages are warranted in his action.

### I.

Beginning in 1977, two North Carolina investment counselors, James G. Mallas and Robert V. Jones, Jr., designed and promoted a tax shelter program based on deductions from participation in coal mining and leasing enterprises. They incorporated several companies for this purpose, including Omega Energy, Inc. ("Omega"), Trinity Properties, Inc. ("Trinity"), and Star Cross Properties, Inc. ("Star Cross"). A criminal investigation by the Internal Revenue Service ("IRS") led to indictments of Mallas and Jones on thirty-five counts of fraud and tax evasion. On January 30, 1984, a jury convicted the two men of fourteen of those counts. Following their convictions, the IRS prepared and disseminated to investors in the Mallas–Jones tax shelter program "pro forma revenue agent reports" ("RARs"), describing Mallas and Jones' "financing scheme" and their convictions, and advising that losses claimed

through the program were disallowed. *See* J.A. at 432–35, 438–39.[1] On May 20, 1985, a unanimous panel of this court reversed all of Mallas' and Jones' convictions as founded upon "an unsubstantiated theory of tax law." *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir.1985). Despite this decision, the IRS continued to disseminate the RARs without modification or amendment to reflect our reversal of Mallas' and Jones' convictions. *See* J.A. at 439.

On October 28, 1988, the plaintiffs brought the instant action against the Government, alleging violations of their constitutional rights under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), violations of the Privacy Act, *see* 5 U.S.C. § 552a, and unauthorized disclosures of their tax return information under 26 U.S.C. § 7431.[2] The district court dismissed all but the section 7431 claims. *See Mallas v. Kolak*, 721 F.Supp. 748 (M.D.N.C.1989). It also dismissed the plaintiffs' claims for actual and punitive damages (allowing them to seek only $1,000 per disclosure under section 7431(c)(1)(A)) and dismissed the corporate plaintiffs. *See* J.A. at 165, 188–92. The court then found the Government liable for seventy-three unlawful disclosures about each of Mallas and Jones, and awarded them $73,000 apiece. *See id.* at 443–46. This appeal, and the Government's cross-appeal, followed.

## II.

The Government, as a threshold matter, argues that the notice of appeal filed by

---

1. Each RAR provided:

 **Advanced Minimum Royalty**

 You deducted losses for advance minimum royalties on your Federal income tax return(s) with respect to coal mining lease(s) entered into with Trinity Properties, Inc. or other related lessors. The coal mining promotion was organized, promoted, and sold by Robert V. Jones, Jr. and James G. Mallas. You paid a portion of the total contract price in cash and financed the balance by executing promissory notes to an entity related to Trinity Properties, Inc.

 On January 30, 1984 in Federal District Court in Charlotte, NC, Mr. Jones and Mr. Mallas were convicted of operating the fraudulent coal mining tax shelter of Trinity Properties, Inc. and Omega Energy, Inc. Mr. Jones and Mr. Mallas were convicted on fourteen counts each including conspiracy, income tax fraud and interstate transportation. It was determined that they made fraudulent representations on the amount of coal reserves subleased to the various investors. With regard to the investors' promissory notes, it was determined that Mr. Jones and Mr. Mallas used a financing scheme involving a check swap designed to give the appearance that each investor borrowed the necessary funds to claim the advance minimum royalty deductions.

 It is determined that the loss or losses claimed by you in connection with Trinity Properties, Inc. or other coal mining leases promoted by Robert V. Jones, Jr. or James G. Mallas are disallowed because it has not been established that the losses were incurred in a trade or business or with respect to property held for the production of income.

 Alternatively, it is determined that the advance minimum royalty expense claimed by you in connection with Trinity Properties, Inc. or other related lessors is not allowable for the following reasons:

 1. You have failed to establish that the claimed expense was paid, and if paid, was paid for the purpose stated.
 2. The promissory notes with respect to the transaction lack economic substance and do not represent bona fide debt obligations.
 3. Any such payments are capital expenditures and do not quality [sic] as royalties under the applicable provisions of the Internal Revenue Code.
 4. Any such payments have the effect of distorting income and do not constitute a method of accounting which clearly reflects income.

 Alternatively, it is further determined that the advance royalty paid (or accrued) by you is deductible only in the year the coal, in respect of which the advance royalty is paid or accrued, is sold.

 Alternatively, it is further determined that since the promissory notes executed by you lack economic substance and do not represent bona fide debt obligations, the portion of the claimed advance minimum royalty represented by such notes cannot be deducted as a portion of the royalty payment. Accordingly, your total deductions attributable to royalty payments is [sic] limited to your cash investment.

 In accordance with the above stated reasons, your income is increased as follows....

 *Id.* at 434–35.

2. The initial complaint listed as plaintiffs not only Mallas, Jones, Omega, Trinity, and Star Cross, but also two other individuals, John William Flint and Perry Brunk, and three other corporations—Peoples Supply Company, Inc., Revel, Inc., and Genesis Leases, Inc. *See* J.A. at 17. The district court dismissed Flint, Brunk, and all six corporate plaintiffs in its September 27, 1991 order. *See id.* at 188–92.

plaintiffs was defective, depriving us of jurisdiction over all of the plaintiffs except Mallas. We agree, and therefore dismiss those plaintiffs.

Federal Rule of Appellate Procedure 3(c) provides: "The notice of appeal shall specify the party or parties taking the appeal...." Although the Rule also provides that "[a]n appeal shall not be dismissed for informality of form or title of the notice of appeal," the Supreme Court recently held that "[t]he failure to name a party in a notice of appeal is more than excusable 'informality'; *it constitutes a failure of that party to appeal.*" *Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 314, 108 S.Ct. 2405, 2407, 101 L.Ed.2d 285 (1988) (emphasis added).

The notice of appeal in the instant case is captioned "JAMES G. MALLAS, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant" and states: "Plaintiffs, by and through their undersigned counsel, give notice of appeal to the United States Court of Appeals for the Fourth Circuit to the Judgment of the Honorable Richard C. Erwin entered and filed June 23, 1992." J.A. at 447. Jones, Omega, Trinity, and Star Cross contend that although their notice of appeal did not specifically name anyone but Mallas, it provided sufficient notice to comply with Rule 3(c) because it used the phrase "et al." in its caption and the plural "Plaintiffs" in its body.

The Supreme Court rejected an almost identical argument in *Torres:*

> *Petitioner urges that the use of "et al." in the notice of appeal was sufficient to indicate his intention to appeal. We cannot agree.* The purpose of the specificity requirement of Rule 3(c) is to provide notice both to the opposition and to the court of the identity of the appellant or appellants. *The use of the phrase "et al.,"* which literally means "and others," *utterly fails* to provide such notice to either intended recipient.... The specificity requirement of Rule 3(c) is met only by some designa-

tion that gives fair notice of the specific individual or entity seeking to appeal.

487 U.S. at 317–18, 108 S.Ct. at 2409 (emphases added).[3]

The plaintiffs attempt to avoid the brunt of *Torres* by relying on the Court's comment that "if a litigant files papers in a fashion that is technically at variance with the letter of a procedural rule, a court may nonetheless find that the litigant has complied with the rule if the litigant's action is the functional equivalent of what the rule requires." *Id.* at 317, 108 S.Ct. at 2409. The use of "et al." and "Plaintiffs," they argue, represents the "functional equivalent" of a name-by-name listing. While the Supreme Court's "functional equivalence" language may seem hard to reconcile with its otherwise strict construction of the Rule, *see id.* at 318–19, 108 S.Ct. at 2409–10 (Scalia, J., concurring in judgment), it is of no avail to the plaintiffs in this case. In the paragraph immediately following the passage quoted by the plaintiffs, the Court explained that despite Torres' use of the phrase "et al.," he *"did not file the functional equivalent* of a notice of appeal." *Id.* at 317, 108 S.Ct. at 2409 (emphasis added). Under *Torres* and Rule 3(c), therefore, we obtain jurisdiction over the only party specified as an appellant in the notice of appeal: James G. Mallas.

In reaching this conclusion, we join at least six other circuits. *See Colle v. Brazos County,* 981 F.2d 237, 240–42 (5th Cir.1993) (use of "et al." and plural "Plaintiffs" did not satisfy Fed.R.App.P. 3(c)); *Adkins v. Safeway Stores, Inc.,* 968 F.2d 1317, 1318–19 (D.C.Cir. 1992) (same), *cert. denied,* ——— U.S. ———, 113 S.Ct. 968, 122 L.Ed.2d 123 (1993); *Pontarelli v. Stone,* 930 F.2d 104, 108–09 (1st Cir.1991) (same); *Laidley v. McClain,* 914 F.2d 1386, 1388–89 (10th Cir.1990) (same); *Pride v. Venango River Corp.,* 916 F.2d 1250, 1251–53 (7th Cir.1990) (same, even where collateral document listed all plaintiffs), *cert. denied,* ——— U.S. ———, 111 S.Ct. 1696, 114 L.Ed.2d 89 (1991); *Minority Employees of Tenn. Dep't of Employment Sec. v. State of*

---

**3.** In holding "et al." insufficient for Fed.R.App.P. 3(c) purposes, the *Torres* Court agreed with a prior decision of this circuit. *See* 487 U.S. at 314 n. 1, 108 S.Ct. at 2407 n. 1 (citing *Covington*

*v. Allsbrook,* 636 F.2d 63, 64 (4th Cir.1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1990, 68 L.Ed.2d 305 (1981)).

*Tenn.,* 901 F.2d 1327, 1330 (6th Cir.) (*en banc*) ("We hold that the term "*et al.*" is insufficient to designate appealing parties in a notice of appeal and that appellants must include in the notice of appeal the name of each and every party taking the appeal."), *cert. denied,* 498 U.S. 878, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990); *see also Worlds v. Department of Health & Rehabilitative Servs.,* 929 F.2d 591, 592–93 (11th Cir.1991) (use of "et al." and plural "Proposed Intervenors" did not satisfy Fed.R.App. 3(c)). None of the cases relied upon by the plaintiffs for the contrary proposition is applicable, and we disagree with those cases to the extent that they may be read to construe Rule 3(c) and *Torres* more narrowly than we do today. *See* Taxpayers' Reply Br. at 1–3.[4]

Because neither Jones, Omega, Trinity, nor Star Cross is named in the notice of appeal, we dismiss each of them for lack of jurisdiction.

### III.

The Government also argues that the district court erred in concluding that the dissemination of the RARs, without mention of our reversal of Mallas' and Jones' convictions, violated 26 U.S.C. § 6103, and thereby gave rise to liability under 26 U.S.C. § 7431.

Section 7431(a)(1) confers upon a taxpayer a cause of action for a knowing or negligent violation of section 6103:

If any officer or employee of the United States knowingly, or by reason of negligence, discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

Section 6103, in turn, sets forth a "general rule" that

[r]eturns and return information shall be confidential, and except as authorized by this title—

(1) no officer or employee of the United States,

· · · · ·

shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section.

*Id.* § 6103(a). The same section defines "return information" as

a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by,

---

4. This is not a case in which the plaintiffs purport to have cured a deficient notice of appeal by timely filing a collateral document specifically naming all the appealing parties. *See Good Samaritan Hosp v. Sullivan,* 952 F.2d 1017, 1021–23 (8th Cir.), *cert. granted,* — U.S. —, 113 S.Ct. 319, 121 L.Ed.2d 240 (1992); *Warfield v. Fidelity & Deposit Co.,* 904 F.2d 322, 325 (5th Cir.1990). Nor is this a case in which the notice specifies that *all* of the plaintiffs appeal, removing any possible confusion. *See Adkins v. United Mine Workers of Am.,* 941 F.2d 392, 396–98 (6th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1180, 117 L.Ed.2d 424 (1992); *Baylis v. Marriott Corp.,* 906 F.2d 874, 876–77 (2d Cir.1990); *see also Milanovich v. Costa Crociere, S.p.A.,* 938 F.2d 297, 298 (D.C.Cir.1991) (*per curiam* ) (use of "et ux." and plural "Plaintiffs" held sufficient where only plaintiffs below were named plaintiff and his wife); *Pope v. Mississippi Real Estate Comm'n,* 872 F.2d 127, 129 (5th Cir.1989) (*per curiam* ) (use of "et al." and plural "Plaintiffs" held sufficient in "limited context" of only two plaintiffs); *cf. Cammack v. Waihee,* 932 F.2d 765,

768–69 (9th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992); *Gilbreath v. Cutter Biological, Inc.,* 931 F.2d 1320, 1322–23 (9th Cir.1991); *Benally v. Hodel,* 940 F.2d 1194, 1197 (9th Cir.1990). The notice of appeal in this case could reasonably be construed as referring to any number of people: Mallas and Jones only; Mallas and some or all of Omega, Trinity, and Star Cross; Mallas and Jones, and some or all of Omega, Trinity, and Star Cross; or, any combination of those parties plus any number of the five other plaintiffs listed in the initial complaint. *See supra* note 2. The only party clearly included in any reading of the notice of appeal is Mallas. Finally, the plaintiffs' reliance on *Ford v. Nicks,* 866 F.2d 865 (6th Cir.1989)—and on *National Center for Immigrants' Rights v. I.N.S.,* 892 F.2d 814 (9th Cir. 1989) (*per curiam* ), which expressly followed *Ford, see id.* at 816—overlooks the fact that the Sixth Circuit *en banc* overruled *Ford. See Minority Employees,* 901 F.2d at 1330. In any event, in both *Ford* and *National Center,* unlike in this case, *all* of the losing parties appealed.

prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense.

*Id.* § 6103(b)(2)(A).[5] It also defines a "disclosure" broadly, as "the making known to any person in any manner whatever a return or return information." *Id.* § 6103(b)(8). The remainder of section 6103 lists certain exceptions to the general rule against disclosure, only section 6103(h)(4)(C) of which is invoked by the Government in this appeal. That section provides that

> [a] return or return information may be disclosed in a Federal or State judicial or administrative proceeding pertaining to tax administration, but only . . .
>
> (C) if such return or return information directly relates to a transactional relationship between a person who is a party to the proceeding and the taxpayer which directly affects the resolution of an issue in the proceeding; . . . . However, such return or return information shall not be disclosed as provided in subparagraph . . . (C) if the Secretary determines that such disclosure would identify a confidential informant or seriously impair a civil or criminal tax investigation.

Within this statutory framework, the Government challenges on three alternative grounds the district court's finding of liability. First, the Government contends that the RARs did not disclose "return information" within the meaning of section 6103(b)(2)(A). Second, it argues that its republication of the information was not a "disclosure" because the information was not confidential. Finally, it argues that the exception for administrative tax proceedings protected its dissemination of the RARs. *See id.* § 6103(h)(4)(C). We reject each of these arguments in turn.

### A.

■■■ The Government first argues that the information in the RARs was not "return information" of Mallas and Jones because it was not prepared by the IRS specifically with respect to their returns. *See* Government's Reply Br. at 3 ("[I]nformation about a taxpayer must have its genesis in an examination or investigation of *that taxpayer's* tax liabilities in order to constitute 'return information.'" (emphasis added)). This argument simply misconstrues section 6103. "Return information" is expansively defined in 26 U.S.C. § 6103(b)(2)(A) (emphases added) as "*any* . . . data . . . prepared by . . . the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of *any* person under this title for *any* tax, penalty, interest, fine, forfeiture, or other imposition, or offense."[6] Taxpayer information obtained or prepared by the IRS, therefore, is "return information" regardless of the person with respect to whom it was obtained or prepared. Accordingly, the RAR "data" about Mallas and Jones was "return information" of those two men because (and even though) it was "prepared by" the IRS "with respect to" the returns or tax liabilities of the investors.

If Congress had intended the construction advanced by the Government, it would have spoken in the clause at issue in this appeal of data prepared by the IRS with respect to "that taxpayer's," "such taxpayer's," or even "the taxpayer's" return and liability, as it did in the immediately preceding clause. *See id.* § 6103(b)(2)(A) ("return information" includes information as to "whether *the taxpayer's* return was, is being, or will be examined or subject to other investigation or processing" (emphasis added)). Instead, the clause refers simply to "a return" and the liability of "any person." That Congress did

---

5. "For purposes of [§ 7431], the terms 'return' and 'return information' have the respective meanings given such terms in section 6103(b)." *Id.* § 7431(e).

6. Under § 7701(a)(11)(B), the term "Secretary" means either the Secretary of the Treasury or his "delegate," a term in turn defined as "any offi-

cer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to perform the function mentioned or described in the context," *id.* § 7701(a)(12)(A)(i).

not intend to limit the definition of "return information" in the manner suggested by the IRS is further evidenced by its inclusion of section 6103(b)(3), which separately defines "taxpayer return information" as return information furnished to the Secretary by the particular taxpayer "to whom such return information relates." This section demonstrates that when it wished to do so, Congress knew well how to require a nexus between return information and the particular taxpayer as to whom it was obtained.

The RAR description of Mallas and Jones' "financing scheme" was, in any event, information "collected by the Secretary" "with respect to the determination" of Mallas' and Jones' liability "for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense." That is, the details of the scheme that appear in the RARs were derived from the IRS' criminal investigation of Mallas and Jones. The Government recognizes as much. It guardedly represents only that "[t]he IRS did not derive *the fact of the convictions* of Mallas and Jones from their income tax returns, or gather *such information* in the course of investigating Mallas and Jones." Government's Br. at 31 (emphases added). By this the Government clearly is referring only to the first two sentences of the RAR's second paragraph. *See* J.A. at 434; *supra* note 1 (quoting RAR in full). The next two sentences of the RAR, however, state:

> It was determined that [Mallas and Jones] made fraudulent representations on the amount of coal reserves subleased to the various investors. With regard to the investors' promissory notes, it was determined that Mr. Jones and Mr. Mallas used a financing scheme involving a check swap designed to give the appearance that each investor borrowed the necessary funds to claim the advance minimum royalty deductions.

J.A. at 434. While these sentences, which nowhere mention the fact of conviction, could refer to the jury's verdict, apparently they refer instead to the *IRS'* determinations as to how Mallas and Jones perpetrated the fraud, which in turn gave rise to the prosecutions and the jury's determinations of guilt. Not even the Government argues that the specific determinations described in these two sentences were those of the jury.

We likely would reject such an argument even had the Government advanced it. In its RARs, the Service used the expletive "it" in the passive verb phrase "it was determined," in such a way as to leave ambiguous whether the determinations described were those of the jury or court, or those of the Service itself. The IRS obviously chose this language deliberately, as is evident from its use of nearly identical, yet in context significantly different, language in each of the immediately succeeding paragraphs. *See id.* at 434–35 (stating that *"it is determined"* that losses claimed are disallowed, that *"it is determined"* that advance minimum royalty expenses claimed by investors are not allowable, that *"it is further determined"* that advance royalties paid are deductible only in year of sale, and that *"it is further determined"* that promissory notes are not deductible because they lack economic substance (emphases added)); *supra* note 1.[7] We would not permit the IRS to prevail on the strength of its own periphrasis.

Finally, the RARs also disclosed other types of "return information." They disclosed the "identity" of each of Mallas and Jones, which the statute defines simply as "the name of a person with respect to whom a return is filed." 26 U.S.C. § 6103(b)(6). Moreover, they disclosed those names in the context of summarizing the "determinations" of the IRS's tax fraud investigation, and the ensuing prosecutions. *See In re Grand Jury Investigation,* 688 F.2d 1068, 1071 (6th Cir. 1982) ("A taxpayer's name and the fact that he is, was or will be subject to an investigation regarding Title 26 obligations, does constitute 'return information' under section 6103(b)(2)(A)."). Similarly, the RARs disclosed the "nature [and] source" of Mallas

---

**7.** In these paragraphs, the IRS appears intentionally to have reinforced the ambiguity left in the two preceding sentences by using the same expletive with the passive voice when it clearly could have, and most naturally would have, stated simply that "the IRS has determined...." There is no question but that these latter paragraphs refer to IRS determinations because no jury had addressed the investors' tax liabilities.

and Jones' income, *see* 26 U.S.C. § 6103(b)(2)(A)—their organization, promotion, and sale of coal mining leases through "Trinity Properties, Inc. or other related lessors," J.A. at 434.

*First Western Government Securities, Inc. v. United States,* 796 F.2d 356 (10th Cir. 1986), on which the Government relies, is not to the contrary. In that case, the IRS had taken the plaintiff's deposition in the course of auditing his investors. When the plaintiff repeatedly invoked the Fifth Amendment, the IRS revised the RARs sent to the investors to report that fact, and the plaintiff alleged a violation of section 6103. In rejecting his and the other plaintiffs' claim, the Tenth Circuit explained that "nothing contained within the revised RAR disclosed plaintiffs' names in the context that they were, would be, or are being investigated for tax purposes." *Id.* at 359. The instant case is different because, as we have explained, the RARs reflected that Mallas and Jones had been "investigated for tax purposes." [8]

### B.

■ The Government next argues that the RARs did not violate section 6103's prohibition against "disclosures" because the information imparted was not confidential. The RARs, the Government contends, simply republished matters of public record, namely the fact of Mallas' and Jones' convictions.

We decline the Government's invitation to usurp the legislative function by adding a judicially created exception to those set forth by Congress in section 6103. Section 6103(a) prohibits the disclosure of taxpayers' "return information," "*except as authorized by this title,*" (emphasis added). In so providing, Congress strictly circumscribed the contexts in which Government officers or employees may disclose such information. Unless the disclosure is authorized by a specific statutory exception, section 6103(a) prohibits it. The Government points to no such excep-

tion—and we are aware of none—permitting the disclosure of "return information" simply because it is otherwise available to the public. As the Supreme Court recently observed in a similar context: "[T]he fact that 'an event is not wholly "private" does not mean that an individual has no interest in limiting disclosure or dissemination of the information.' " *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 770, 109 S.Ct. 1468, 1480, 103 L.Ed.2d 774 (1989) (citation omitted); *see also Thomas v. United States,* 890 F.2d 18, 21 (7th Cir.1989) (recognizing "the fiction ... that every item of information contained in a public document is known to the whole world, so that further dissemination can do no additional harm to privacy—as if only secrets could be confidences"). Indeed, the Government itself appears uncomfortable with its argument to the contrary, conceding that a "disclosure" may involve *either* "information [that] is confidential," *or* information that is "*available to a limited few.*" Government's Reply Br. at 5 (emphasis added).

Despite its lack of statutory support, the Government urges us to join the Ninth Circuit in holding that once return information is within the public domain, it loses section 6103 protection. *See William E. Schrambling Accountancy Corp. v. United States,* 937 F.2d 1485 (9th Cir.1991) (no section 6103 violation because return information included in notices of federal tax liens and in bankruptcy petition is "in public domain" and "no longer confidential"), *cert. denied,* —— U.S. ——, 112 S.Ct. 956, 117 L.Ed.2d 123 (1992); *Lampert v. United States,* 854 F.2d 335, 338 (9th Cir.1988) ("[O]nce return information is lawfully disclosed in a judicial forum, its subsequent disclosure by press release does not violate the Act."), *cert. denied,* 490 U.S. 1034, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989). As the Government notes, however, at least one circuit has reached a contrary conclusion. *See Rodgers v. Hyatt,* 697 F.2d 899, 906 (10th

---

8. The Tenth Circuit also treated as significant plaintiff's invocation of the Fifth Amendment after he had been called to provide information *"as a third party."* 796 F.2d at 359 (emphasis added). As we hold today, however, § 6103(b)(2)(A) does not prohibit disclosure of a taxpayer's return information only if it was collected while investigating that taxpayer. *See supra* p. 1118. And even if the prohibition were so limited, the IRS, as discussed, clearly gathered the RAR information as to Mallas and Jones' "financing scheme" in the course of investigating Mallas and Jones themselves.

Cir.1983) ("The issue ... is not the loss of 'confidentiality' or 'privacy' but, rather, whether ... [the IRS] made an unauthorized disclosure of tax return information...."); *accord Chandler v. United States,* 887 F.2d 1397, 1398 (10th Cir.1989) *(per curiam).*

The Government argues that "the Tenth Circuit erred" and that "[t]he Ninth Circuit's analysis strikes a better balance between the Government's legitimate interests in disclosing return information to administer the tax laws and a taxpayer's reasonable expectations of privacy." Government's Br. at 36. It is for Congress, however, not this court, to "strike a balance" between these interests. Congress has done so in section 6103, without articulating the exception advanced by the Government in this litigation and adopted by the Ninth Circuit in *Lampert* and *Schrambling.* Indeed, the Ninth Circuit essentially concedes that its approach hews less closely to the text of section 6103 than does our contrary construction. *See Lampert,* 854 F.2d at 338 (conceding that "a strict, technical reading of the statute supports the taxpayers' position" that public availability does not eliminate need for specific statutory exception). .

■ The RARs, in any event, did more than simply repeat the public fact of Mallas' and Jones' convictions. As we explained above, they described with specificity the "financing scheme" that underlay those convictions. *See supra* Part III.A. This alone distinguishes the instant case from *Thomas, supra,* in which the IRS issued a press re-

lease drawn directly and entirely from a Tax Court opinion. *See* 890 F.2d at 20–21.[9]

■ The plain purpose of section 6103 is to encourage full compliance with the tax laws by assuring taxpayers that *the IRS will not disclose* the information provided to it in confidence. In furtherance of this purpose, Congress defined a section 6103 "disclosure" broadly as "the making known to any person in any manner whatever a return or return information." 26 U.S.C. § 6103(b)(8). Therefore, even to the extent that the RARs repeated information otherwise available to the public, they still fell within this broad definition.[10]

### C.

■ Even if the RARs did constitute "disclosures" of "return information," the Government argues, the disclosures were authorized under the exception for administrative tax proceedings, *see* 26 U.S.C. § 6103(h)(4)(C). We disagree.

Congress imposed four requirements on the invocation of this exception. First, the disclosure must occur "in a Federal or State judicial or administrative tax proceeding pertaining to tax administration." Second, the information disclosed must "directly relate[ ]" to a "transactional relationship" between a party to the proceeding and the taxpayer. Third, this "transactional relationship" must "directly affect[ ] the resolution of an issue in the proceeding." Finally, the IRS must not have determined that the disclosure "would identify a confidential informant or seriously

9. Because of this specific circumstance, the Seventh Circuit refused to "take sides in the conflict between the Ninth and Tenth Circuits over whether the disclosure of return information in a judicial record bars the taxpayer from complaining about any subsequent disclosure." *Id.* at 20.

10. We also reject the Government's alternative argument, that no § 6103 "disclosure" occurred because Mallas and Jones had kept their investors informed of developments in the prosecution, *see* J.A. at 131–43, 438, so that the investors had already learned of the information imparted by the RARs. As with its "public domain" argument, the Government cites no statutory exception excusing the IRS from compliance with § 6103 where the taxpayer has seen fit to disclose his own information to persons of his choosing. The statute itself suggests that no such

exception exists because it permits disclosure "to such person or persons as the taxpayer may designate in a *written request for or consent to* such disclosure." 26 U.S.C. § 6103(c) (emphasis added). The Government does not allege that Mallas and Jones provided such a request or consent. Nor does the Government cite any decision permitting Government disclosure because the taxpayer has previously disclosed his information to selected individuals. Indeed, even the Government concedes that information "available to a limited few" may still be protected from disclosure. *See* Government's Reply Br. at 5. Section 6103 addresses what Government agents may do with a taxpayer's return information, not what the taxpayer may do with his own such information.

impair a civil or criminal tax investigation." *See supra* p. 1117 (quoting section 6103(h)(4)(C) in full). We hold that the exception does not protect the Government's conduct in the instant case for at least two reasons: first, because the Government has failed to meet the threshold requirement that the disclosure have occurred in a "judicial or administrative tax proceeding pertaining to tax administration"; and second, because the disclosed information about Mallas and Jones did not "directly relate[ ] to a transactional relationship" between a party to the proceeding and those two men.

Neither section 6103 itself nor the Code's general definition section, *see* 26 U.S.C. § 7701, defines the term "administrative proceeding." [11] While 26 U.S.C. § 7430(c)(5) defines the same term as "any procedure or other action before the Internal Revenue Service," that definition is expressly limited to section 7430's provisions concerning the award of fees and costs. *See id.* § 7430(c). Moreover, an attempt to import this definition into section 6103(h)(4) confirms the definition's inapplicability: it would render superfluous the qualifying phrase "pertaining to tax administration"—defined in section 6103(b)(4) broadly to include almost any activity before the IRS—because an administrative proceeding would necessarily be one "before the Internal Revenue Service."

 Without a statutory definition of the term, the Government relies instead, without discussion, on the Tenth Circuit's decision in *First Western* in support of its

summary assertion that the IRS' audit of Mallas and Jones' investors was an "administrative proceeding pertaining to tax administration," *see* Government's Br. at 37 (citing 796 F.2d at 360). Although the *First Western* decision shares the Government's conclusion, it also shares its lack of reasoning, offering no more than *ipse dixit* on this question. *See* 796 F.2d at 360. The Tenth Circuit's decision, therefore, is analytically unsatisfying.[12]

We hold, in the absence of plain language (or, for that matter, any evidence) to the contrary, that section 6103(h)(4)(C) does not authorize audit disclosures, and we reject the Government's sweeping contrary construction of that section. In section 6103, Congress describes audits as investigations and specifically distinguishes investigations from "administrative proceedings." In section 6103(h)(4)(C), unlike in parallel provisions, it provides only for disclosures during proceedings. Collectively, these provisions constitute, in our view, clear evidence that Congress did not intend to authorize audit disclosures in section 6103(h)(4)(C).

Congress characterizes an audit as an investigation in at least two places in section 6103 itself. Section 6103(h)(5), for example, permits the IRS to disclose to Justice Department attorneys whether a prospective juror "has or has not been the subject of *any audit or other tax investigation* by the Internal Revenue Service," (emphasis added). Section 6103(k)(6), even more tellingly, treats

---

**11.** The term "tax administration," in contrast, has an exhaustive definition in § 6103(b)(4):

The term "tax administration"—
(A) means—
(i) the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws or related statutes (or equivalent laws and statutes of a State) and tax conventions to which the United States is a party, and
(ii) the development and formulation of Federal tax policy relating to existing or proposed internal revenue laws, related statutes, and tax conventions, and
(B) includes assessment, collection, enforcement, litigation, publication, and statistical gathering functions under such laws, statutes, or conventions.

**12.** The other authority relied upon by the Government is no more satisfying. In refuting the claims of the corporate plaintiffs, the Government also cites the opinions of two Tenth Circuit district courts for the proposition that an audit is an "administrative proceeding pertaining to tax administration." *See* Government's Br. at 23 (citing *First W. Gov't Sec., Inc. v. United States*, 578 F.Supp. 212, 217 (D.Colo.1984), *aff'd*, 796 F.2d 356 (10th Cir.1986), and *Nevins v. United States*, 88–1 U.S.Tax Cas. (CCH) ¶ 9199, 1987 WL 47316 (D.Kan.1987)). The first, the lower court in the *First Western* case, simply remarked that "[t]here is little doubt that an audit, with its numerous procedural steps and protections and its appeal process, constitutes an administrative proceeding pertaining to tax administration." 578 F.Supp. at 217. The second offered even less reasoning, citing the first without discussion. *Nevins*, 88–1 U.S.Tax Cas. (CCH) ¶ 9199.

an audit as an investigation in the specific context of disclosure limitations. That section authorizes "[d]isclosure by internal revenue officers and employees for *investigative* purposes," and provides:

> An internal revenue officer or employee may, *in connection with his official duties relating to any audit,* collection activity, or civil or criminal tax investigation or any other offense under the internal revenue laws, *disclose return information to the extent that such disclosure is necessary in obtaining information, which is not otherwise reasonably available,* with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of this title. *Such disclosures shall be made only in such situations and under such conditions as the Secretary may prescribe by regulation.*

(Emphases added); *see also* 26 C.F.R. § 301.6103(k)(6)–1 (1992).[13] Indeed, it appears that not even the IRS characterizes its audits as more than investigations. While its regulations repeatedly describe the internal appeals process, in which taxpayers protest audit results, as "proceedings," *see* 26 C.F.R. § 601.106(b) ("Initiation of *proceedings* before Appeals" (emphasis added)); *id.* § 601.106(c) ("Nature of *proceedings* before Appeals" (emphasis added)); *id.* ("*Proceedings* before Appeals are informal." (emphasis added)), those regulations nowhere refer to audits as "proceedings," *see* 26 C.F.R. § 601.105.[14]

Scrutiny of section 6103 confirms that as an "investigation," a tax audit is *not* an "administrative proceeding." The statute expressly distinguishes "investigations" from "proceedings" in several places. Section 6103(i), for example, distinguishes on two separate occasions between disclosure to agents engaged in "preparation for any judicial or *administrative proceeding,*" and disclosure to such agents engaged in "any *investigation which may result in such a proceeding.*" *See* 26 U.S.C. § 6103(i)(1)(A)(i)–(ii), (2)(A)(i)–(ii) (emphases added). Section 6103(h)(2)(C) also expressly distinguishes between "investigations" and "proceedings." And notably, because in relevant respects it is almost identical to section 6103(h)(4)(C), this section authorizes disclosure in both "proceedings" *and* "investigations." It permits disclosure to Justice Department employees "[i]n a matter involving tax administration,"

> solely for their use in any proceeding before a Federal grand jury or preparation for *any proceeding (or investigation which may result in such a proceeding)* before a Federal grand jury or any Federal or State court, but only if— …
>
> (C) such return or return information relates or may relate to a transactional relationship between a person who is or may be a party to the proceeding and the taxpayer which affects, or may affect, the resolution of an issue in such *proceeding or investigation.*

(Emphases added).[15]

That Congress differentiated "investigations" from "proceedings" throughout section

---

**13.** The Supreme Court also has described an audit as an "investigation" and as part of the IRS' "investigative authority." *E.g., United States v. Bisceglia,* 420 U.S. 141, 146, 95 S.Ct. 915, 919, 43 L.Ed.2d 88 (1975); *see also United States v. Baggot,* 463 U.S. 476, 477–78, 103 S.Ct. 3164, 3165–66, 77 L.Ed.2d 785 (1983) (describing IRS audit as "civil tax investigation").

A review of a tax audit's mechanics reinforces the conclusion that an audit is merely an investigation. A revenue agent conducting a tax audit performs quintessentially investigative functions, such as examining a taxpayer's books, papers, records, and other materials, and deposing witnesses. *See* 26 U.S.C. §§ 7601, 7602; 26 C.F.R. § 601.105 (1992).

**14.** Not insignificantly, as the Government conceded at argument, the IRS audit would not

satisfy the Administrative Procedure Act (APA)'s definition of the analogous term "agency proceeding." The APA defines the term "agency proceeding" as "rule making" ("formulating, amending, or repealing a rule"), "adjudication" ("the formulation of an order"), or "licensing" ("the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license"). *See* 5 U.S.C. § 551(5), (7), (9), (12).

**15.** Section 6103(h)(2)(C)'s addition of the phrase "or investigation" is not attributable to that section's focus on judicial—rather than administrative—proceedings. Section 6103(h)(4)(C), on which the Government relies, likewise addresses judicial proceedings, but includes no such addition.

6103, and authorized the disclosure of certain return information during "investigations" in subsection (h)(2)(C) but not in subsection (h)(4)(C), is persuasive evidence that Congress did not intend for the latter to authorize audit or investigation disclosures. " '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (citation omitted).

It appears that Congress intended to address disclosures during audits and other investigations principally, if not exclusively, through section 6103(k)(6). *See, e.g., Kemlon Prods. & Dev. Co. v. United States*, 638 F.2d 1315 (5th Cir.), *modified on other grounds*, 646 F.2d 223 (5th Cir.), *cert. denied*, 454 U.S. 863, 102 S.Ct. 320, 70 L.Ed.2d 162 (1981). This section, and its accompanying regulations, which specifically authorize disclosures during the course of audits, strictly limit such disclosures to those required in order to obtain information not otherwise reasonably available. In fact, if the Government were correct in its argument that all audits are administrative proceedings, there would not even have been need for section 6103(k)'s explicit disclosure authorization.[16]

 Even were we to accept the Government's position that the disclosures occurred during an "administrative proceeding pertaining to tax administration," we would still hold that the disclosures were unauthorized, because they do not satisfy section 6103(h)(4)(C)'s second requirement—that the disclosed information "directly relate[ ]" to a "transactional relationship" between the investors and Mallas and Jones. Even though we had reversed all of the convictions, the RARs stated: "*It was determined* that [Mal-

las and Jones] made fraudulent representations on the amount of coal reserves subleased to the various investors. With regard to the investors' promissory notes, *it was determined* that Mr. Jones and Mr. Mallas used a financing scheme involving a check swap designed to give the appearance that each investor borrowed the necessary funds to claim the advance minimum royalty deductions." J.A. at 434 (emphases added); *see also supra* note 1. Under our system of law, once we reversed Mallas' and Jones' convictions, it was, as a substantive matter, as if the referenced determinations had never been made. As a consequence, these statements could not possibly have had any bearing upon, much less have "directly related to," a "transactional relationship" between Mallas and Jones and their investors.

Because the RARs were not disseminated in an administrative proceeding and because the information included in them did not otherwise satisfy the requirements of section 6103(h)(4)(C), we conclude that the Government may not avail itself of that section to excuse its unauthorized disclosure.

### IV.

 The Government also challenges the district court's calculation of the number of unauthorized disclosures for purposes of computing damages under section 7431. The court treated an RAR mailed to two named persons as two acts of disclosure. "Damages are not based on the number of persons who may have read or heard the wrongful disclosure," the court reasoned, "[r]ather, damages for unauthorized disclosure [are] determined by the number of persons or institutions sent the document." J.A. at 443. Because the IRS mailed RARs to seven individual investors and thirty-three married investors who had filed joint returns after the reversal of Mallas' and Jones' convictions, the court counted seventy-three unlawful disclosures. *See id.* at 444.[17]

---

**16.** That § 6103(k)(6) might render § 6103(h)(4)(C) unnecessary, of course, does not mean that § 6103(k)(6) authorizes the IRS' conduct in this case. Not only does the Government not contend that the disclosures at issue were permitted by § 6103(k)(6) and the accompanying

regulations, it does not even cite this section of the statute.

**17.** As the Government notes, *see* Government's Br. at 39–41, the district court only found § 7431 liability for the disclosures made *after* our rever-

The Government argues that the court incorrectly counted the number of addressees, rather than the number of RARs. A single RAR sent to two married investors, it contends, represents only a single "disclosure." We disagree.

■ Section 7431(c)(1)(A) imposes damages of "$1,000 for each act of unauthorized disclosure of a return or return information," and section 6103(b)(8) defines a "disclosure" as "the making known to any person in any manner whatever a return or return information." We conclude from these provisions that the "act" to be counted for computing damages is the "making known to any person in any manner whatever" the return information. Each time the Government "makes known" return information to a person in violation of section 6103, it has committed an "act of unauthorized disclosure." The Government's contrary construction effectively reads out of the section the phrase "in any manner whatever": If the IRS addresses and mails a single RAR to two people, it makes the information in the RAR known to each of them no differently than if it had decided to use two copies of the RAR, two envelopes, and two stamps. Nothing in the language of the statute suggests that Congress meant to reward the IRS, having been found liable for violating section 6103, for the fortuity of having multiple investors living under one roof.[18] We therefore affirm the district court's calculation of the number of disclosures.[19]

## V.

■ The only remaining issue is Mallas' challenge to the district court's dismissal of his claims for punitive damages under 26 U.S.C. § 7431(c). In summarily dismissing those claims, the court apparently accepted the Government's argument that Mallas' failure to produce evidence of actual damages precluded the award of punitive damages. *See* J.A. at 90, 165.

We agree with Mallas that the Government's argument rests upon a misreading of section 7431(c). That section provides:

(c) Damages.—In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of—

(1) the greater of—

(A) $1,000 for each act of unauthorized disclosure of a return or return

---

sal of Mallas' and Jones' convictions. In an earlier ruling, the court concluded that "the IRS could lawfully disclose information which mentioned the convictions *before* May 20, 1985," the date on which we reversed the convictions. *See* J.A. at 173–74 (emphasis added). The court thus apparently believed that the Government could only be held liable for its dissemination of false or misleading return information. *See id.* at 443 ("Taken as a whole, the information imparted in each Pro Forma RAR was misleading, incomplete, and inaccurate."). We find no basis in either § 6103 or § 7431 for distinguishing between clear, complete, and accurate information on the one hand, and "misleading, incomplete, and inaccurate" information on the other. The statute distinguishes between *authorized* and *unauthorized* disclosures of return information, without respect to its truth or falsity. Because the post-reversal disclosures were unauthorized, *see supra* Part III, the pre-reversal disclosures would logically have been unauthorized as well. Nonetheless, because Mallas has apparently never raised this issue, we decline to disturb that portion of the district court's holding.

**18.** None of the cases cited by the Government for its argument on this issue are to the contrary. *See William E. Schrambling Accountancy Corp. v.*

*United States,* 689 F.Supp. 1001 (N.D.Cal.1988) (awarding $55,000 where IRS mailed notices of levy to 55 clients of taxpayer-plaintiff), *rev'd on other grounds,* 937 F.2d 1485 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 956, 117 L.Ed.2d 123 (1992); *Johnson v. Sawyer,* 640 F.Supp. 1126 (S.D.Tex.1986) (awarding $21,000 where IRS mailed press releases to 21 media outlets); *Malis v. United States,* 59 A.F.T.R.2d (P–H) ¶ 87–501 (C.D.Cal.1986) (awarding $2,000 where IRS agent had two separate conversations with two different individuals). None of these cases dealt with the issue before us of whether a single RAR addressed and mailed to two investors constitutes one or two "acts" of disclosure.

**19.** We reject the Government's nonsensical argument that an RAR mailed to two addressees constitutes a single disclosure *unless both addressees read the RAR,* in which event there are two disclosures. *See* Government's Br. at 43. Either there are two disclosures because the RAR was mailed to two addressees or there are no disclosures (a possibility for which the Government does not even argue) because neither addressee read the RAR. That is, whether or not there has been a disclosure depends *either* upon whether an RAR was disseminated to an individual *or* upon whether the individual read it.

**1126**

information with respect to which such defendant is found liable, or

(B) the sum of—

(i) the actual damages sustained by the plaintiff as a result of such unauthorized disclosure, plus

(ii) in the case of a willful disclosure or a disclosure which is the result of gross negligence, punitive damages, plus

(2) the costs of the action.

This statute does preclude the award of *both* punitive damages under subsection (1)(B)(ii) *and* the statutorily prescribed damages under subsection (1)(A). It does not, however, prevent the award of punitive damages *instead of* subsection (1)(A) damages. That is, a taxpayer may recover punitive damages, even where his actual damages are zero, provided those damages exceed the amount of the subsection (1)(A) damages.[20]

On remand, the district court should provide Mallas an opportunity to prove that the IRS acted willfully or with gross negligence. If the court finds that the IRS did so act, and that more than $73,000 in punitive damages are appropriate, then it should award him that amount instead of $73,000.

### CONCLUSION

All of the appellants in No. 92–1982 other than James G. Mallas are dismissed for lack of jurisdiction. The judgment of the district court in No. 92–2027 is affirmed. The judgment of the district court in No. 92–1982 is vacated and remanded as to James G. Mallas only, for a determination of whether punitive damages are warranted and for an award of the greater of those damages or $73,000.

*DISMISSED IN PART, AFFIRMED IN PART, VACATED IN PART, AND REMANDED.*

---

**20.** As the Government correctly notes, two district courts have reached the contrary interpretation. *See* Government's Br. at 27–28 (citing *Smith v. United States*, 730 F.Supp. 948 (C.D.Ill. 1990), *aff'd in part & rev'd in part*, 964 F.2d 630 (7th Cir.1992) (holding damages issues moot), *cert. denied*, —— U.S. ——, 113 S.Ct. 1015, 122 L.Ed.2d 162 (1993), and *Marré v. United States*, 70 A.F.T.R.2d (P–H) ¶ 92–5159, 1992 WL 240527 (S.D.Tex.1992)). We find neither of these decisions persuasive. The first addressed the question only in *dicta* because it found no willfulness or gross negligence. *See Smith*, 730 F.Supp. at 955. The second offered no reasoning whatsoever on the issue, and simply relied on the first. *See Marré*, 70 A.F.T.R.2d (P–H) at 92–5161 n. 3, 1992 WL 240527 at *4.